Bilgai DIAZ and Lidia Diaz Plaintiffs,

v.

ALLSTATE INSURANCE GROUP, an Illinois corporation; Allstate Insurance Company, an Illinois corporation; Shadowbrook Engineering, Inc., a California corporation; Western States Geotechnical Engineering Corporation, a California corporation; Hakimian Engineering, a California corporation, and Does 1 through 100, inclusive, Defendants.

No. CV 96–8292 CM.

United States District Court,
C.D. California.

Oct. 14, 1998.

ry & Barbanel, LLP, Los Angeles, CA, for Plaintiffs.

Gregory Michael MacGregor, Deborah A. Berthel, MacGregor & Berthel, Woodalnd Hills, CA, for Defendants.

ORDER GRANTING PLAINTIFF'S MO-
TION FOR REMAND; AND DENY-
ING DEFENDANTS' MOTION TO
DISMISS MISJOINED DEFEN-
DANTS.

MORENO, District Judge.

## I.

### *INTRODUCTION AND RELEVANT FACTUAL BACKGROUND*

This is an action for compensatory, emotional distress and punitive damages based on theories of breach of contract, breach of the implied covenant of good faith and fair dealing, unfair business practices, and unlawful discrimination arising out of plaintiffs' earthquake insurance claim under their All-state homeowner's policy for damages incurred at their residence. Plaintiffs' home is a 3,430 square foot, five-bedroom single family tract home built in 1977 in the Porter Ranch area which had an appraised pre-earthquake fair market value of $365,000.

Plaintiffs allege that defendants Allstate Insurance Group, Allstate Insurance Company and Allstate Personal Property & Casualty Company, among other Allstate entities ("Allstate"), wrongfully denied plaintiffs their full insurance benefits after they suffered property damages arising out of an earthquake in January, 1994 in Northridge. Plaintiffs also seek specific performance of an express promise by Allstate defendants to settle the insurance claim by exercising their option under the insurance policy to "repair, rebuild or replace" plaintiffs' dwelling.[1] Last, plaintiffs also seek injunctive relief barring the defendants' alleged misconduct un-

John N. Quisenberry, Brian S. Kabateck, Terry R. Bailey, Gary L. Holmes, Quisenber-

---

1. The relevant policy section states that:
   In the event of a covered loss, we have the option to:
   A. Repair, rebuild, or replace all or any part of the damaged, destroyed, or stolen property with property of like kind and quality within a reasonable time; or

   B. Pay for all or any part of the damaged, destroyed, or stolen property.
   It is undisputed that Allstate notified Plaintiff that it intended to settle the claim by exercising its option to 'repair, rebuild or replace' the dwelling in accordance with the provisions in Paragraph(s).

der California laws addressing unfair competition and discriminatory business practices.

Allstate, Allstate Company, and Allstate Casualty, among other potential Allstate entities ("Allstate") had issued a policy of insurance to Plaintiffs that covered homeowner's property damage and personal property losses from various perils, including earthquakes. For an additional premium, Allstate provided coverage for property damage caused indirectly by earthquake through fire, explosion, or breakage. For another additional premium, the Allstate defendants provided plaintiffs with full or "Home Replacement Cost Guarantee" coverage for their dwelling as well as a ten percent increase in the coverage provided for other structures. For a further additional premium, the Allstate defendants also provided limited coverage for building code upgrades. In return, plaintiffs paid premiums that were collected and transmitted to Allstate.

On or about January 17, 1994, plaintiffs, who are of Cuban descent, suffered repairable and irreparable damage to their home and personal property caused by the Northridge Earthquake.[2] Plaintiffs allege that Allstate failed to properly adjust their claim and failed to pay their full policy benefits.[3] As a result, plaintiffs allege that they have been left with inadequate means to repair and/or replace their property.

2. The total costs to repair or replace the dwelling exceed the jurisdictional minimums of this Court, and have already exceeded the deductible amount of Plaintiff's policy.

3. The relevant policy section regarding Payment for Loss provides:

Payment for covered losses to building structures insured under the Dwelling Protection coverage will be by one of the following methods:
(a) Replacement cost. This means there will not be a deduction for depreciation. Payment will not exceed the smallest of the following amounts:
(1) the replacement cost of that part of the building structure damages for equivalent construction and use on the same premises; or
(2) the amount actually and necessarily spent to repair or replace the damaged building structure.

Plaintiffs, in their First Amended Complaint, argue that "[d]espite this express promise by the Allstate Defendants to satisfy their obligations under the Policy by in fact repairing, rebuilding or replacing the Diaz residence, two years have elapsed without the Allstate defendants proceeding any further with the repair, rebuilding or replacement of the Diaz residence."

Furthermore, plaintiffs allege that the Allstate defendants have breached the Policy by "unreasonably refusing to pay, and continuing to withhold Policy benefits now due and payable under the terms of the Policy." The Allstate defendants, according to plaintiffs, breached the policy by "making unreasonable demands on the plaintiffs, not engaging in a prompt investigation of plaintiffs' claims, and forcing plaintiffs to institute this litigation to obtain their benefits."[4]

Aside from Allstate's alleged failure to settle the claim, plaintiffs also allege that Allstate "deliberately, unjustifiably, and unreasonably" underestimated the losses claimed by plaintiffs by substantial amounts. Furthermore, they claim, amidst a host of other allegations, that Allstate: (a) deliberately concealed their methodology regarding claim adjustment; (b) deliberately retained unlicensed, uncertified, and/or unqualified contractors and/or engineers who were inadequately trained and equipped to perform the duties required of them; (c) withheld policy benefits and failed in good faith to attempt to

We will not pay more than the actual cash value of the damaged building structure until the repair or replacement is completed.
(b) Actual cash value. This means there may be a deduction for depreciation.
If you do not repair or replace the damaged building structure, settlement will be on an actual cash value basis, not to exceed the liability shown on the declarations page for Coverage A–Dwelling protection. You may make a claim for any additional payment on a replacement cost basis if you repair or replace the damaged building within 180 days of the actual cash value payment.

4. The Contract also Specifies that:

We will settle any covered loss with you . . . We will settle within 60 days after the amount of loss is finally determined. This amount may be determined by an agreement between you and us, an appraisal award, or a court judgment.
Defendant's Exhibit C at 21.

settle the disputes; and (d) intentionally and arbitrarily discriminated against plaintiffs based on their color, race, ancestry and/or national origin.

Based on the foregoing allegations, plaintiffs alleged five separate causes of action against Allstate: (1) breach of contract; (2) tortious breach of the implied covenant of good faith and fair dealing; (3) conspiracy to commit unfair business practices; (4) equitable relief; (5) unlawful discrimination.

Although the complaint was originally filed in state court on October 28, 1996, Allstate removed the action to federal court on November 26, 1996 under 28 U.S.C. § 1441(b).[5] Following a Court-ordered stay of the action in which the parties completed the appraisal process contemplated by the insurance policy, plaintiffs filed a First Amended Complaint (the "Complaint") by stipulation of the parties.[6] According to the Complaint, the Appraisal Board decided on a total award of $804,814.91, but Allstate has not yet paid any amount, even after a sixty-day deadline for final settlement had passed.

In July, plaintiffs filed their first amended complaint, adding defendants Shadowbrook, Western States, and Hakimian, ("recently-added defendants") who are California residents that destroyed complete diversity.[7] Along with Allstate, plaintiffs charged the recently-added defendants with conspiracy to commit unfair business practices. Because the defendants have already been added, it

now remains for the Court to determine whether the recently-added defendants were fraudulently joined or whether remand is required under § 1447(e).

The crux of the motions filed by plaintiffs and defendants turns on whether or not the recently-added defendants Shadowbrook, Western States, and Hakimian are properly joined in this action. According to plaintiffs, Shadowbrook, Western States, and Hakimian wrongfully assisted the Allstate Defendants in carrying out their allegedly unlawful insurance practices. Such wrongful assistance included (but was not limited to) providing early reports which severely underestimated damage, failure to provide engineering drawings to Bonham Construction Company of the quality necessary to assist it in proper estimation of a cost estimate; choosing compaction grouting as an expensive but inferior alternative to complete demolition and rebuilding of plaintiffs dwelling; and substantially overcharging for performing the compaction grouting. Plaintiffs allege that they were damaged by the conspiracy in that it prevented an expedient settlement of Plaintiff's claim, and that the recently-added defendants' conduct constituted part of Allstate's overall scheme to reduce the cost of insurance claims brought against them.

In order to determine whether the parties are fraudulently joined, the Court must determine whether plaintiffs can state a claim against the individual California companies.

5. Plaintiffs are residents of the County of Los Angeles, State of California; and defendants Allstate is an organization of insurance companies with its principal place of business in the State of Illinois, but authorized to transact the business of insurance in the State of California.

6. The section of the policy governing appraisal provides:

If you and we fail to agree on the amount of loss, either party may make written demand, for an appraisal. Upon such demand, each party must select a competent and impartial appraiser and notify the other of the appraiser's identity within 20 days after the demand is received. The appraisers will select a competent and impartial umpires. If the appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the residence premises is located to select an umpire.

The appraisers shall then determine the amount of loss, stating separately the actual cash value and the amount of loss to each item. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of loss. If they cannot agree, they will submit their differences to the umpire. A written award by any two will determine the amount of loss.

7. Defendant Shadowbrook Engineering, Inc. ("Shadowbrook") is a corporation organized and existing under the laws of the State of California with its principal place of business in Glendale, California. Defendant Western States Geotechnical, Inc. ("Western States") is a corporation organized and existing under the laws of the State of California with its principal place of business in Anaheim, California. Defendant Hakimian Geotechnical Consultants, Inc. ("Hakimian") is a corporation incorporated in the State of California.

If so, then remand is required under § 1447(e).

## II.

### ANALYSIS

### A. THE LAW GOVERNING FRAUDULENT JOINDER

A defendant may remove a case with a non-diverse defendant on the basis of diversity jurisdiction and seek to persuade the district court that the defendant was fraudulently joined. *McCabe v. General Foods Corp.,* 811 F.2d 1336, 1339 (9th Cir.1987). The Ninth Circuit has observed, "fraudulent joinder is a term of art. If a plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state, the joinder of the resident defendant is fraudulent." *Id.*

As a matter of general principle, however, courts generally employ a presumption against fraudulent joinder. *Lieberman v. Meshkin, Mazandarani,* 1996 WL 732506 at *2 (N.D.Cal. Dec. 11, 1996). This presumption is often expressed by a series of requirements placed upon the moving party. First, defendants who assert fraudulent joinder carry a heavy burden of persuasion. *Id.* "The defendant need not show that the joinder of the non-diverse party was for the purpose of preventing removal. Instead, the defendant must demonstrate that there is *no possibility that the plaintiff will be able to establish a cause of action* in state court against the alleged sham defendant." *Good v. Prudential Insurance Company of America,* 5 F.Supp.2d 804, 807 (N.D.Cal.1998).

Second, it must appear to "a near certainty" that joinder was fraudulent. *Lewis v. Time, Inc.,* 83 F.R.D. 455, 466 (E.D.Cal. 1979), *aff'd,* 710 F.2d 549 (9th Cir.1983). This occurs if the plaintiff has *no ·actual intention to prosecute* an action against those particular resident defendants. *Boyer v. Snap–On Tools Corp.,* 913 F.2d 108, 111 (3rd Cir.1980) (citation omitted).

Third, merely showing that an action is likely to be dismissed against that defendant does not demonstrate fraudulent

joinder. "The standard is not whether plaintiffs will actually or even probably prevail on the merits, but whether there is a possibility that they may do so." *Lieberman,* 1996 WL 732506 at *3. Finally, in resolving the issue, the court must further resolve all ambiguities in state law in favor of the plaintiffs. *Bravo v. Foremost Insurance Group,* 1994 WL 570643 at * 2 (N.D.Cal. Oct. 11, 1994).

### B. ANALYSIS UNDER RULES 19 and 20

Allstate makes a number of arguments in support of its motion to sever the allegedly misjoined defendants Shadowbrook, Hakimian, and Western States. First, Allstate argues that the California residents are not indispensable parties and that leave to amend should not have been granted. Second, in its Motion to Dismiss Misjoined Defendants, Allstate argues that the sole purpose of plaintiffs' addition of the three firms is to destroy diversity. The only method to add such parties, Defendants argue, is under Rule 19, which establishes that

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action is so situated that the disposition of the action in the person's absence may (i) as a· practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

According to Allstate, plaintiffs seek amendment for an improper purpose—to destroy diversity and deprive this Court of jurisdiction.

### 1. Indispensability

The argument regarding indispensability offered by defendants is unavailing. As the Ninth Circuit in *Desert Empire Bank v. Insurance Co. of North America* observed, if the defendant is a "proper" party to litiga-

tion, then his joinder is governed by Rule 20's provisions for permissive joinder, not Rule 19. In *Desert Empire,* the district court granted leave to amend to a party who sought to add a non-diverse defendant seven days after a summary judgment motion had been argued. Notably, the Ninth Circuit considered the amendment of the non-diverse party in terms of Rule 15 and Rule 20, and declined to analyze the amendment under Rule 19. It concluded:

> We need not decide whether [the non-diverse party] was a 'person needed for just adjudication' of this litigation, or was a so-called 'indispensable' or 'necessary' party who should have been joined, if feasible, under Rule 19...We conclude that [the non-diverse defendant] [ ] was, at the least, a 'proper' party to this litigation, and that the district court correctly allowed his joinder pursuant to the provisions for permissive joinder under rule 20.

*Id. Desert Empire,* 623 F.2d 1371, 1374 (9th Cir.1980). The Ninth Circuit found that "diversity jurisdiction of the district court was destroyed at the moment the court granted [ ] leave [to amend]." *Id.* at 1374.

The facts of *Desert Empire* are strikingly similar to the instant case, because both deal with questions of agency. Here, plaintiffs sought leave to add a series of individuals contracted by Allstate; in *Desert Empire,* plaintiffs sought to add an insurance agent employed by an insurance company. The Court will further analyze the issue of agency principles in the following section *under Rule 20;* therefore, the court need not address whether defendants are "indispensable" or "necessary" parties for the purposes of Rule 19.[8]

As *Desert Empire* directs, plaintiffs' amendment of three non-diverse parties as party defendants brings into consideration Rules 15 and 20 of the Federal Rules of Civil Procedure. Rule 15 provides that a party may amend its pleading after a responsive pleading has seen served "...only by leave of the court or by written consent of the adverse party." Rule 20(a) imposes two specific requirements for the permissive joinder of parties: (1) a right to relief must be asserted by, or against, each plaintiff or defendant relating to or arising out of the same transaction or occurrence or series of transactions or occurrences; and (2) some question of law or fact common to all parties must arise in the action. *See Desert Empire,* 623 F.2d at 1375, citing *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 558 F.2d 914 (9th Cir.1977). Parties are misjoined when they fail to satisfy these preconditions. The Court finds that both conditions are satisfied for the purposes of Rule 20.

### 2. Right to Relief

█ Allstate argues that the engineering firms are not indispensable parties under Rule 19, because they are being sued solely in connection with engineering services they provided to Allstate as independent contractors in connection with plaintiffs' claim. Therefore, complete relief can be accorded among Allstate and plaintiffs despite the absence of the recently-added defendants. Last, Allstate points out that the recently-added defendants claim no "interest relating to the subject of the action."

The Court has already explained why Rule 19 should not be employed in these circumstances under *Desert Empire.* In conjunction with Rule 15, Rule 20 allows for permissive joinder of parties, and in particular of party defendants, "...if there is asserted against (the defendants) jointly, severally, or in the alternative, *any right to relief in respect to or arising out of the same transaction, occurrence, or series of transactions of occurrences...* " The Court finds that plaintiffs have satisfied this condition. Allstate fails to convince the Court that the recently-added defendants are not "proper" parties to the litigation under Rule 20.

First, in a status report filed by Allstate on July 27, 1998, Allstate makes direct reference to the alleged "scheme," and even places a certain level of blame on both plaintiffs and the recently-added defendants by observing

---

8. Another court has observed in a similar situation, "It is not necessary for the Court to find that the proposed party is "indispensable" under Rule 19." *Metzger v. Guardian Life Insurance Company,* 1996 WL 511638 at *3 (Sept. 3, 1996, N.D.Cal.1996).

[d]uring the course of plaintiffs' accumulating and providing the requested documentation, Allstate came into the possession of credible evidence, under oath, that the insureds participated in a *fraudulent scheme to bilk the company in connection with the more than $790,000 it previously paid for 'soil preparation' in connection with the repair of the house.* Allstate has referred the evidence to coverage counsel to determine the impact of this evidence on plaintiffs' entitlement to further proceeds of the policy. Allstate is also looking into whether or not the matter should be referred to civil authorities for criminal investigation. In any event, this evidence will be material, if not dispositive, to the issues raised by the instant action.

Defendant's Exhibit B at 22, Memorandum of Points and Authorities in Support of Motion to Dismiss for Failure to State a Claim.

Second, although the Court recognizes that Allstate places the locus of blame on plaintiffs, it is certainly conceivable that the culpable acts were committed not by the plaintiffs, but the recently-added defendants that Allstate employed. Allstate's Answer to the original complaint provides further support for this contention, in which Allstate asserts an affirmative defense conceding

[t]he losses, if any, of which Plaintiffs complaint were solely and proximately caused by acts, conduct or omissions of Plaintiffs and/or third parties over whom Allstate had no control. The acts, conduct, and/or omissions of such person intervened between the acts, conduct and/or omissions of Allstate, if any, and were the sole and legal cause of Plaintiff's damages, if any.

Notably, Allstate has brought a claim against Western States and Harry Booth, the adjuster assigned to the plaintiffs' claim. In a complaint filed against Booth on June 10, 1998, *Allstate Insurance Company v. Harry Booth, aka Harry Miller, et al.* case no. SACV 98–503 LHM, filed in district court, Allstate asserts that

Booth knowingly and deliberately breached those duties beginning in early 1994 by embarking on a scheme, device and plan, with others, to cheat and defraud Allstate out of hundreds of thousands, if not millions, of dollars. Allstate is further informed and believes, and on that basis alleges, that in order to carry out this scheme, Booth conspired with and used engineers and contractors to prepare inflated estimates regarding the scope of damage to the insureds' homes and the cost to repair or replace damage caused by the Northridge Earthquake.

Allstate is further informed and believes, and or that basis alleges, that Booth conspired with Defendants Dunn-rite [also used in the Diaz reparation] ...to inflate estimates to repair damage, perform unnecessary testing on insureds' homes and generally swindle Allstate out of hundreds of thousands, if not millions, of dollars. Allstate is informed and believes, and on that basis alleges, that Booth received 'kickbacks' from contractors and possibly others in exchange for defrauding Allstate by submitting inflated damage repair estimates and facilitating payments by Allstate based on such inflated estimates....

See *Plaintiffs' Exhibit A in Opposition to Defendant Allstate's Motion to Dismiss* at 7 ("Booth action"). Aside from these general allegations, Allstate also alleges that Western States and others "[prepared] ... inflated estimates to repair/ replace residences where the damage, if any, caused by the Northridge earthquake was substantially less..."; that Western States and others "[submitted] to Allstate inflated and dishonest damage reports and estimates;" that Western States and others "[caused] Allstate to pay ... to contractors, engineers and other vendors monies for unnecessary ... work, services and repairs."

Curiously, however, Allstate maintains that "[t]he only person/entity that would have been injured by this conduct would be Allstate and it is pursuing its claim in a separate action." The Court disagrees with this observation. If the recently-added defendants contributed to the problems encountered by the Diazes, then it is appropriate for the Court to consider them in one action. Here, plaintiffs make strikingly similar allegations against Western States to the *Booth* action, namely, that it overcharged for compaction grouting and inflated prices for post-

earthquake repairs, actions which may have precluded the completion of repairs and the establishment of a final settlement. While Allstate may be right to point out that Allstate has been *financially* harmed as a result of the alleged "conspiracy," Allstate fails to consider the fact that the Diazes' have also suffered: their residence allegedly remains in substantial disrepair. Moreover, Allstate has failed to reach settlement or bring a separate action against the recently-added defendants in connection to the Diaz claim. Because plaintiffs were allegedly prevented from full receipt of their entitlements on account of the conspiracy, they should be permitted to pursue claims against those individually and collectively responsible in one action.

Third, Allstate also fails to consider the *public harm* caused by the alleged conspiracy: conspiratorial acts are not only harmful to the parties in this action, but also detrimentally affect the economic community by unfairly and inappropriately affecting the proper operation of the free market. A conspiracy, either between Allstate and the contractors, or between the contractors themselves, potentially erodes the public's already compromised faith in the insurance business as a whole and exacts a significant toll on the assumption of fair dealing and truthfulness that should characterize any transaction. Particularly in the wake of a disastrous earthquake, the Court finds that it would be unconscionable to prevent the Diaz family from pursuing all available means to reach an equitable settlement and/or pursue claims against those potentially responsible.

Consequently, the Court finds that the plaintiffs have asserted a right to relief against each defendant arising out of the series of transactions involving repairs after the earthquake. Plaintiffs allege that Allstate saved substantial sums than they otherwise would have had to pay on account of the conspiracy. Furthermore, plaintiffs allege that Defendants Shadowbrook and Western States participated in the conspiracy whereby these companies "would provide engineering reports to the Allstate Defendants on earthquake damaged homes which showed

damage to be much less than actually incurred." If such allegedly unlawful acts of the recently-added defendants served as the proximate cause for Allstate's ensuing failure to offer an equitable settlement, or to complete repairs on the home, then plaintiffs must logically be able to assert a claim for relief against those defendants. Last, the Court finds that the recently-added defendants enjoy substantial interests in the instant litigation, both of a reputational and financial nature. Fraudulent behavior, under the UCA, is a strict liability offense that involves disgorgement of profits.[9]

### 3. Common Questions of Law and Fact

Under Rule 20, proper joinder also requires the presence of a question of law or fact common to all parties in the action. In evaluating whether or not Plaintiffs may state a claim against the recently-added defendants for the purposes of Rule 20, the Court must analyze: (1) whether sufficient facts are alleged to permit plaintiffs to state a claim for conspiracy against the recently-added defendants; (2) whether the parties were acting in the scope of their duty to defendant Allstate; (3) whether the Unfair Competition Act applies to these circumstances in light of *Moradi–Shalal's* preclusion of private rights of action.

### a. Conspiracy

▮▮▮▮ The Court finds that plaintiffs have alleged sufficient facts to suggest an unlawful conspiracy involving all defendants. There are two specific elements of an action for civil conspiracy: (1) the formation and operation of the conspiracy and (2) damage resulting to plaintiff from an act or acts done in furtherance of the common design. "[T]he major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity." *Mox Incorporated v. Woods,* 202 Cal. 675, 677–78, 262 P. 302 (1927).

---

9. See Section c. on the applicability of the Unfair Competition Act for further discussion.

A civil conspiracy does not per se give rise to cause of action unless a civil wrong has been committed resulting in damage. *Unruh v. Truck Insurance Exchange,* 7 Cal.3d 616, 631, 102 Cal.Rptr. 815, 498 P.2d 1063 (1972). For example:

> The cause of action arises out of some wrongful act committed by one or more of the conspirators, and if such a wrongful act is set forth the conspiracy averment is unnecessary to the statement of a cause of action...The allegation of a conspiracy nevertheless serves a purpose. If the plaintiff seeks to hold several defendants liable for a tort as joint tortfeasors, he must prove that each in some way participated in the wrong. If he can show that each committed a wrongful act or some part of it, e.g., that each made false representations, he has no need of averments of conspiracy. But if A alone made representations the plaintiff can hold B and C liable with A only by alleging and proving that A acted pursuant to an agreement (conspiracy) with B and C to defraud. Thus the purpose of the allegation is to establish the liability of B and C as joint tortfeasors regardless of whether either was a direct participant in the wrongful act.

5 Witkin, Pleading 3d § 869 (1985).

Plaintiffs assert that all defendants conspired to commit unfair business practices under Business and Professions Code Section 17200, et seq. More specifically against the recently-added defendants, Plaintiffs allege:

> [S]hortly after the Northridge Earthquake, Shadowbrook, and Western States were engineering firms neither licensed in California to perform engineering work nor employing engineers licensed in California to perform such work;
>
> [S]hortly after the Northridge Earthquake, Shadowbrook, and Western States entered into a conspiracy with the Allstate Defendants whereby Shadowbrook and Western States would provide engineering reports to the Allstate Defendants on earthquake damaged homes which showed damage to be much less than actually incurred by these homes;
>
> [O]ften Shadowbrook and Western States would provide draft engineering reports to representatives, agents, and employees of the Allstate Defendants who in turn would correct the reports to show less than actual damage and return these reports to Shadowbrook and Western States to be finalized. The final reports would then be issued by Shadowbrook and Western States containing the corrections written by the representatives, agents, and employees of the Allstate Defendants;
>
> [M]any of the reports of Shadowbrook and Western States were issued under the stamp of one George Bach, who had retired and moved out of state. He had not removed his stamp from the offices of Western States, which continued to use it to give their reports the mark of authenticity;
>
> [T]he purpose of the conspiracy between the Allstate Defendants and Shadowbrook and Western States was to use the engineering reports produced by Shadowbrook and Western States to reduce the claims of earthquake victims...Plaintiffs...allege that the Allstate Defendants used such engineering reports to successfully settle a large number of claims for considerably less than their actual value;
>
> Allstate Defendants permitted Shadowbrook and Western States to perform engineering work on earthquake damaged homes at inflated prices; [and, among other claims]
>
> The conspiracy and acts in furtherance thereof constitute unfair business practices under Business and Professions Code section 17200, et seq.

Much of the dispute centers around the route chosen by Allstate to repair (or replace) the structure. Apparently, the cost of the repairs were much higher than anticipated, a factor that seems to have substantially contributed to the delay in settling the policy. According to plaintiffs, Shadowbrook and Western States, in their initial assessments, recommended that the structure be demolished and rebuilt. However, Allstate, instead of proceeding with the conclusions of the two firms, implored Western States to recommend a cheaper alternative. In turn, Western States recommended a procedure called compaction grouting, whereby a concrete

mixture is injected into the ground support for plaintiffs' home. According to a letter dated December 14, 1995 to Dave Schmidt of the Allstate Company, Western States referred to Allstate's suggestions in this matter:

> This letter is a review of the grading recommendation in our August 24, 1994 Preliminary Soils Investigations...The original recommendation of regarding the lot required demolition and removal of the existing structure. At some time later *we were asked to review the site for alternatives to demolition, regrading, and reconstruction.* Our report of August 3, 1995 presented compaction grouting as a more economic alternative. At this time we drilled a boring to a depth of 68 feet. The conditions encountered in the boring were such that to adequately stabilize the soil by grading, the scope of the work and cost would be significantly greater. This made compaction grouting the clear choice.

According to plaintiffs, Western States then "grossly and intentionally" inflated the cost of performing the compaction grouting, and thus furthered the conspiracy. Accordingly, the Court finds that the plaintiffs have stated sufficient facts to suggest the formation and operation of a conspiracy that undoubtedly affected the execution and adjustment of their insurance policy.

b. *Agency*

■■■ However, even if a conspiracy is established, plaintiffs must be able to prove that they can individually state a claim against each defendant. Often, the answer to this question turns on agency principles, a factor overlooked by both parties in its arguments. If the recently added defendants are "agents" under Allstate, they cannot be held individually liable and added as separate defendants.[10] Under California law, Allstate, a corporation, cannot "conspire" with its agents, employees, or officers. *Brown v. Allstate*, 17 F.Supp.2d 1134, 1138–39 (S.D.Cal. 1998), citing *Doctors' Co. v. Superior Court*, 49 Cal.3d 39, 44, 260 Cal.Rptr. 183, 775 P.2d 508 (1989). *See also Davis & Cox v. Summa Corp.*, 751 F.2d 1507 (9th Cir.1985).

The question whether the independent contractors served as "agents" for Allstate is therefore of primary importance in determining fraudulent joinder. For example, in *McCabe v. General Foods*, the Ninth Circuit found fraudulent joinder where a supervisor defendant acted as an agent of the company when it terminated the plaintiff. Since the "agency" relationship in *McCabe* was obvious under the laws of the state, the joinder was determined to be fraudulent and for the sole purpose of defeating diversity jurisdiction. *McCabe*, 811 F.2d at 1337–39.

The instant case is not nearly as clear-cut as *McCabe*. In *McCabe*, the court found "there was no feasible way that the supervisor who fired the plaintiff could have been acting in his own interests." *Bravo v. Foremost Insurance Group*, 1994 WL 570643 at *3 (N.D.Cal. Oct. 11, 1994). Here, plaintiff alleges that the defendants procured an independent monetary benefit from the prohibited activity. At least one court has declined to find fraudulent joinder in such circumstances.[11] In *Bravo*, a district court found that a law firm hired by an insurance company could be categorized as an independent contractor in the context of an action that involved the destruction of evidence in connection with an insurance investigation:

> The attorneys were possibly agents of the insurance company, however, they additionally had a duty to the plaintiff...Their

---

**10.** Even if the defendants recently joined were indeed found to be agents, they could still be held individually liable for conspiracy liability for conduct which the agents carry out "as individuals for their individual advantage and not solely on behalf of the principal." *Doctors' Company v. The Superior Court of Los Angeles County*, 49 Cal.3d 39, 46–47, 260 Cal.Rptr. 183, 775 P.2d 508, (1989).

**11.** In another, similar case, the California Court of Appeal observed that if through fraud and conspiracy other persons assist a broker in violating his fiduciary obligation to his principal by making a secret profit and retaining the proceeds therefrom, they, as well as the fiduciary, are equally liable for all the consequences of the conspiracy, regardless of the extent of their participation of the share of the secret profits obtained. *Anderson v. Thacher*, 76 Cal.App.2d 50, 71, 172 P.2d 533 (1946). Whether a conspiracy actually occurred and its purpose are primarily questions of fact. *Id.* at 74, 172 P.2d 533.

interests were independent from those of the insurance company that they represented. Though their client was the insurance company, they still owed a separate and independent duty to the plaintiffs... *Id.* at *3. Because this was not a case where the attorneys were so closely related to the client insurance company that their duties were one and the same, the Court deemed them to be independent actors, responsible for their own actions, earning their own fee. *Id.* at *4. Consequently, the plaintiffs were permitted to state a claim against the law firm individually in connection with an insurance dispute.

The key questions, which both parties have failed to raise, is (1) the degree of control Allstate enjoyed over the recently-added defendants, and (2) whether they were acting in the course and scope of their employment with the defendant Allstate. See *Zogbi v. Federated Department Store,* 767 F.Supp. 1037 (C.D.Cal.1991). The Ninth Circuit has found that state law directs that a party seeking to prove agency must convince the trier of fact by a preponderance of the evidence that the person for whom the work is performed has the right to control the activities of the alleged agent. It is not necessary to prove that the principal exercised his right of control or actually supervised the work of the agent, so long as the existence of the right is established from the facts. *Fenton v. Freedman,* 748 F.2d 1358, 1361 (9th Cir.1984), citing *Malloy v. Fong,* 37 Cal.2d 356, 370, 232 P.2d 241 (1951), and *Desuza v. Andersack,* 63 Cal.App.3d 694, 699, 133 Cal.Rptr. 920 (1976). However, if control may be exercised only as to the result of the services performed and not the means and methods by which it is accomplished, then the provider is an independent contractor, and not an agent. *Id.,* citing *White v. Uniroyal, Inc.,* 155 Cal.App.3d 1, 25, 202 Cal. Rptr. 141 (1984).

The Court finds that it is reasonably possible that the recently-added defendants served as agents of Allstate and independent contractors *at the same time.* Under general agency principles, one who ·contracts to act on behalf of another and is subject to the other's control, may be both an agent and an independent contractor. See Restatement of Agency §§ 2; *Harby v. Saadeh,* 816 F.2d 436, 439 (9th Cir.1987).

Even still, Allstate may be liable for the acts of its independent contractors when an agency relationship is demonstrated. See *Sugimoto v. Exportadora De Sal. S.A. De. C.V.,* 19 F.3d 1309, 1311–12 (9th Cir.1994), *cert. denied,* 513 U.S. 1018, 115 S.Ct. 581, 130 L.Ed.2d 496 (1994). It is clear from the allegations made that Allstate may have exerted some degree of control over the added defendants in the context of ordering them to explore and recommend cheaper alternatives. It is, therefore, conceivable that the alleged inflation was caused in part by the creation and execution of a conspiracy between the parties. As such, the Court declines to dismiss the defendants from the instant case. Courts have held that distinguishing between an employee and an independent contractor "requires a fact-specific inquiry which depends on the economic realities of the situation." See, for example, *Mitchell v. Howard Memorial Hosp.,* 853 F.2d 762, 766 (9th Cir. 1988) (internal quotations omitted) (reversing a district court's dismissal of claim made on finding that plaintiff was an independent contractor and not an employee). When asked to resolve a fundamental, dispositive factual dispute, the Court declines to resolve this issue with the disfavored remedy of dismissal. See *Brown v. Allstate,* 17 F.Supp.2d 1134 (S.D.Cal.1998) (making this observation).

However, "even though the agent is the 'servant' of the insurer within the rule imposing vicarious liability on a master for his or her servant's torts, the insurer is not liable if, at the time, the third person was injured, the agent was not acting within the scope of his or her authority." 4 Couch on Insurance § 56:8 (3d. ed.), citing *Dillon v. Prudential Ins. Co.,* 75 Cal.App. 266, 242 P. 736 (1925).[12] Plaintiffs assert that

---

**12.** However, employees and agents of a corporation are insulated from allegations of conspiracy *only if* their actions are privileged. The question of privilege, however, is usually a question of fact. See *Clement v. American Greetings Corporation,* 636 F.Supp. 1326, 1333 (S.D.Cal.1986) (finding that the question of privilege in connection with whether conspiracy existed to be a

at all times mentioned herein, Shadowbrook, Western States and Hakimian were each the agent of each of the Allstate Defendants and were each at all times acting within the scope of such agency. Each of the Allstate Defendants actively participated in, or subsequently ratified and adopted, or both, each and all of the acts, conduct and/or omissions alleged of Shadowbrook, Western, and Hakimian with full knowledge of all of the facts and circumstances, including, but not limited to, full knowledge of each and all of the violations of the rights of the Plaintiffs.

In determining whether or not the engineers were acting within the scope of their employment, the Court is mindful of the distinction California courts have used between actions "on the policy" of the insurance contract, and actions not "on the policy." Actions not "on the policy" of the insurance contract usually weigh in favor of finding independent liability. The touchstone case exploring this question is *Murphy v. Allstate Ins. Co.*, 83 Cal. App.3d 38, 147 Cal.Rptr. 565 (1978). In *Murphy,* an insured's bad faith action was based on allegations that workers retained by the insurer to repair and restore the insured's fire-damaged property created further damage in the process. It was also alleged that the insurer had unjustifiably prosecuted an interpleader action resulting in delay of payment to the insured of money owed to him following an appraisal. *Id.* at 46, 147 Cal.Rptr. 565.

In determining that the insured's action was not on the policy, the court pointed out that the wrongful conduct was "with respect to the repair and restoration of the damaged property and the employment of persons to do that work and the allegedly unjustified initiation and prosecution by Allstate of the interpleader action..." Id at 46, 147 Cal. Rptr. 565. Further, the court found that the damages sought

> are not for any loss covered by the insurance policy but for damage to plaintiffs' home and personal property resulting from the untimely and unworkmanlike efforts of the persons and firms Allstate either employed or caused plaintiffs to employ, for

the expenses incurred by plaintiffs in connection with the interpleader action and the [third party suit] against plaintiffs allegedly resulting form Allstate' failure to make prompt payment.

*Id.* In that case, as in the instant case, plaintiffs alleged that the "shoddy work was caused in party by Allstate's practice of arbitrarily reducing the amounts bid by these persons and firms as the reasonable cost of the restoration and repair work." *Id.* at 42, 147 Cal.Rptr. 565.

*Murphy* compels the same conclusion in this case: even if the recently-added defendants can be classified as "employees" or "agents," plaintiffs can still state a claim for relief against them individually, owing to the conspiratorially poor quality of workmanship alleged in the Complaint. Furthermore, even if a fact-finder concludes that they are independent contractors, or alternatively, served as agents and independent contractors simultaneously, then it is still appropriate to add them as individual defendants.

#### c. *Application of the Unfair Competition Act*

The final issue to be resolved involves a question of law: whether Plaintiffs can state a claim against the recently-added defendants for conspiracy to commit unfair business practices under § 17200 of the California Business and Professions Code. Defendants argue that the acts listed in its Third Cause of Action as "unfair" or "unlawful" are not cognizable under § 17200 as a matter of law because the California Supreme Court has ruled that acts which could be brought as violations of the Insurance Code 790.03 cannot be "borrowed" to serve as a basis for an action under § 17200. In *Moradi–Shalal,* the California Supreme Court found that the Legislature did not intend to create new causes of action when it enacted section 790.03. As such, it denied a private right of action based on alleged violations of 790.03. According to Defendants, Plaintiffs are merely improperly attempting to recast an alleged "unfair claim practice" under Ins.Code

factual question that precluded summary judg-

ment).

790.03 as an "unfair business practice" under § 17200.

■ An "unlawful business practice or act" is an act or practice, committed pursuant to business activity, that is at the same time, forbidden by law. *Klein v. Nature's Recipes, Inc.*, 69 Cal.Rptr.2d 623, 59 Cal. App.4th 965 (1997). Virtually any law can serve as predicate for suit under UCA prohibition of unfair competition. *Id.* Section 17200 of the Business and Professions Code ("section 17200") deems any "unlawful" or "fraudulent" business act practice to be unfair competition.

As the California Supreme Court observed, section 17200 "borrows" violations of other laws and treats them as unlawful practices that are independently actionable under the UCA. *Farmers Ins. Exchange v. Superior Court*, 2 Cal.4th 377, 6 Cal.Rptr.2d 487, 826 P.2d 730 (1992). The statute prohibits all business practices that are unlawful, unfair, or fraudulent, not merely anti-competitive. *Hudgins v. Neiman Marcus Group, Inc.* 41 Cal.Rptr.2d 46, 34 Cal.App.4th 1109 (1995), rehearing denied, as modified, review denied. Most reported cases involving "unlawful business practices," however, have been predicated on state law violations. Laws that have been enforced under section 17200's "unlawful" prong include state anti-discrimination laws, environmental protection laws, state labor laws, and state vehicle laws. *See State Farm Fire and Casualty Co. v. Allegro*, 45 Cal.App.4th 1093, 1103, 53 Cal.Rptr.2d 229 (1996) (listing relevant citations).

■ Under the UCA, injunctive relief to prevent such conduct, and/or restitution, (i.e., disgorgement) of money or property wrong-

fully obtained "by means of such unfair competition" are authorized. Bus & Prof.Code, § 17203.[13] Under California law, a private plaintiff may bring action under unfair competition statute to redress any unlawful business practice, including those that do not otherwise permit a private right of action, such as a criminal statute. *Haskell v. Time, Inc.*, 965 F.Supp. 1398 (E.D.Cal.1997).

■ Although the insurance business is expressly subject to the provisions of the UCA by Ins.Code 1861.03, the California Supreme Court has held that provisions of section 790.03 may not be 'borrowed' to serve as a basis for an action under the UCA. *Manufacturers Life Ins. Co. v. Superior Court*, 10 Cal.4th 257, 283–84, 41 Cal.Rptr.2d 220, 895 P.2d 56 (1995). This leaves the question of whether allegations of fraudulent activity are sufficient, notwithstanding *Moradi–Shalal*, to state a cause of action for relief under the UCA. *See State Farm*, 45 Cal.App.4th at 1105–06, 53 Cal.Rptr.2d 229. The court finds that the answer must be yes.

First, and most importantly, plaintiffs are not seeking to recover under section 790.03.[14] While plaintiffs' allegations charge violations of several of the statutory proscriptions in section 790.03, they also allege acts that amount to common law fraud. "A claim for injunctive or restitutive relief under the UCA can be based on any fraudulent or unlawful or unfair business activity." *State Farm*, supra, at 1106, 53 Cal.Rptr.2d 229. The Court finds, as *State Farm* did, that Section 17200 does indeed permit the plaintiffs to state a claim against all defendants for fraud despite *Moradi–Shalal*.[15] As the court observed,

---

**13.** Business and Professions Code section 17203 provides: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

**14.** The Court is mindful that plaintiffs' allegations do implicate several subdivisions of section 790.03, specifically (but not limited to) those subdivisions that address misrepresentation to claimants, failure to adopt reasonable standards for prompt investigation; not attempting to settle in good faith to effectuate a prompt settlement; compelling insureds to institute litigation to recover amounts due; delaying the investigation or payment of claims; and failing to settle claims promptly.

**15.** The Court does not express an opinion as to whether plaintiff's UCA claims have any merit or whether plaintiffs will be able to establish suffi-

While *Moradi–Shalal* clearly held that the Legislature did not intend to create new causes of action when it enacted section 790.03, it is also clear that the legislature did not intend in any way to circumscribe the previously existing common law right of an insured to seek redress for an insurer's fraudulent deception or breach of the covenant of good faith implied in the policy.

*Id.* at 1107, 53 Cal.Rptr.2d 229. In fact, the *Moradi–Shalal* court expressly carved out permission for analogous suits:

Although no private civil cause of action against an insurer for bad faith is available under the Unfair Practices Act, the courts retain jurisdiction to impose civil damages or other remedies against insurers in appropriate common law actions based on such traditional theories as fraud, infliction of emotional distress, and, as to the insured, either breach of contract or breach of the implied covenant of good faith and fair dealing.

*Moradi–Shalal v. Fireman's Fund Insurance Companies,* 46 Cal.3d 287, 290, 250 Cal.Rptr. 116, 758 P.2d 58 (Cal.1988). In the Court's view, plaintiffs' allegations do not amount to a mere relabeling of section 790.03. See *State Farm,* 45 Cal.App.4th at 1108, 53 Cal.Rptr.2d 229.

Second, the "unfair" standard, the second prong of section 17200, also provides an independent basis for relief. *State Farm,* 45 Cal.App.4th at 1103, 53 Cal.Rptr.2d 229.

The test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications, and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim...'

*Id.* An "unfair" business practices occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *People v. Casa Blanca Convalescent Homes, Inc.,* 159 Cal.App.3d 509, 530, 206 Cal.Rptr. 164 (1984).

cient facts to justify damages, injunctive, or resti-

Given the gravity of the harm alleged and the constellation of facts set forth in the Complaint, the Court finds that plaintiff's allegations, if proven, constitute an unfair business practice.

■ In sum, the Court finds that notwithstanding *Moradi–Shalal,* allegations of fraudulent and unfair business activity are sufficient to state a cause of action for relief under the UCA. Because such causes of action are independently actionable from 790.03, the Court finds that *Moradi–Shalal* does not preclude them from stating a claim under the UCA.

## C. STANDARDS FOR REMAND

28 U.S.C. § 1447(e) provides that: [i]f after removal a plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court. The Ninth Circuit has held that section 1447(e) requires remand of a complaint to state court once the plaintiff joins a non-diverse party. *Yniques v. Cabral,* 985 F.2d 1031, 1034 (9th Cir.1993). In *Yniques,* the court observes that Congress stated,

[Section 1447(e)] takes advantage of the opportunity opened by removal from a state court to permit remand if a plaintiff seeks to join a diversity-destroying defendant after removal....Joinder coupled with remand may be more attractive than either dismissal under 19(b) or denial of joinder....

*Id.* at 1035, citing H.R. Rep. No. 889, 100th Cong., 2d Sess. 72–73(1988).

28 U.S.C. § 1447(e) specifically applies to cases removed to federal court on the basis of diversity jurisdiction in which plaintiffs then seek to add defendants destructive of diversity. Section 1447(e) provides two options: the Court may either deny the amendment or permit the amendment and remand to state court.

Given the above allegations of conspiracy and fraud against the recently-added Defendants, the Court is not persuaded that plaintiffs' sole reason for bringing the present

tutive relief.

motion is to destroy diversity and deprive this Court of its jurisdiction. While the Diazes doubtless prefer to litigate their case in state court, where they filed it originally, there is no indication that destroying diversity is their sole purpose in adding the defendants. Plaintiffs have alleged sufficient facts suggesting that the recently-added defendants were integrally involved in fashioning alternatives and determining the costs of repair that has seemingly precluded both parties from achieving settlement and/or completing repairs.

### III.

### *CONCLUSION*

For the foregoing reasons, the Court finds that the case should be remanded to state court to further address this action in its entirety. As this court was deprived of jurisdiction the moment that the non-diverse parties were properly joined, see *Desert Empire*, 623 F.2d at 1374, it declines to rule on the other motions pending for lack of jurisdiction. The Court orders the present action to be remanded to the state court for further proceedings therein.

IT IS SO ORDERED.